# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the*<br>*person by name and address)*<br><br>586 East Washington Blvd., Apartment #4<br>Pasadena, California 91104 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 5:23-MJ-00131

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1341, 1343, 1349, 1028A, and 1029 | See attached affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DOL-OIG Special Agent, Marinel Cortez
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Riverside, CA</u>

Honorable Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: Courtney N. Williams (x1473)

## AFFIDAVIT

I, Marinel Cortez, being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.    I am a Special Agent ("SA") with the United States Department of Labor, Office of Inspector General ("DOL-OIG") and have served in this capacity since August 2022.  I am presently assigned to the Los Angeles Field Office.  My responsibilities as a DOL-OIG SA include investigating unemployment insurance fraud, mail fraud, identity theft, and other related crimes.  I have participated in numerous enforcement actions, search warrants, and arrest warrants.  I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.  As part of that training, I successfully completed courses in criminal and constitutional law.  Before my employment with DOL-OIG, I was employed as a deportation officer for Immigration & Customs Enforcement, Enforcement and Removal Operations ("ICE-ERO") and served in that capacity since April 2016.  As part of my duties with ICE-ERO, I was responsible for apprehension and enforcement of individuals that entered the United States illegally. Moreover, as a federal law enforcement agent engaged in enforcing federal laws, I am authorized by law to request a search warrant.

### II. PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of an application for a warrant to search (1) the residence located at 586 East Washington Boulevard, Apartment 4, Pasadena, California 91104

("SUBJECT PREMISES"); (2) and the person of Demetria Shaunta Lacey ("LACEY"); and (3) a white Acura TLX, with VIN number19UUB1F59GA013808, with a California license plate number 8SHJ632 ("SUBJECT VEHICLE"), registered to LACEY described in Attachments A-1, A-2, A-3, respectively, for the purpose of seizing and searching the items described in Attachment B, which are the evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 1029 (fraud and related activity in connection with access devices), 1028A (aggravated identity theft), 1341 (mail fraud), 1343 (wire fraud), and 1349 (conspiracy to commit mail or wire fraud) (collectively, the "Subject Offenses").  The SUBJECT PREMISES, LACEY, and SUBJECT VEHICLE which are described more fully in Attachments A-1, A-2, A-3, and B, I incorporate fully into this warrant application by reference.

3.   The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates are approximate.

### III. BACKGROUND ON PANDEMIC UNEMPLOYMENT ASSISTANT UNDER THE CORONAVIRUS AID, RELIEF AND ECONOMIC SECURITY ACT UNEMPLOYMENT INSURANCE CLAIMS

4.    Based on my training, education, and experience, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, your Affiant knows the following:

a.    On March 13, 2020, the President of the United States declared the COVID-19 pandemic an emergency under the Robert T. Stafford Disaster Relief and Emergency Assistance Act. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was enacted to provide emergency assistance and health care response for individuals, families, and businesses affected by the COVID-19 pandemic.  The CARES Act included, among other things, the establishment of various forms of unemployment insurance ("UI"): (1) the Pandemic Unemployment Assistance ("PUA") benefit to provide financial assistance to individuals who are out of work due to the pandemic including those who do not usually qualify for regular state UI, such as self-employed, contract, and "gig workers," (2) the Pandemic Emergency Unemployment Compensation benefit, a 13-week benefit extension for people who have used all benefits available in their regular UI claim, and (3) the Pandemic Additional Compensation benefit, an additional $600 federal stimulus payment automatically added to each week of benefits received between March 29, 2020 and July 25, 2020.

b.    Collectively these programs offered up to 46 weeks of UI benefits to workers who were not previously eligible

for regular UI benefits but became unemployed or partially
unemployed for a COVID-19-related reason.[1]

c.   In California, the California Employment
Development Department ("EDD") administers the state's UI
benefits program.  EDD began accepting applications for PUA
benefits on or about April 28, 2020.  To make benefits available
as quickly as possible, payments were issued in phases.  If a
claimant qualified for PUA benefits, the minimum payment was
$167 per week plus up to an additional $600 per week from March
to July 2020 depending on when the claim was submitted.

d.   PUA applicants were eligible for more than the
minimum weekly benefit amount of $167 if their annual income for
2019 reported on the PUA application met a minimum threshold of
$17,368.

e.   On August 8, 2020, after federally funded
extensions to UI benefits expired, the "Lost Wages Assistance
Program" ("LWAP") established a temporary measure to provide an

---

[1] COVID-19-related reasons for being out of work include:
being diagnosed with COVID-19 or experiencing symptoms of
COVID19 and seeking a medical diagnosis; being unable to work
because a health care provider advised self-quarantining due to
concerns related to COVID-19; having a household member who has
been diagnosed with COVID-19; providing care for a family or
household member who has been diagnosed with COVID-19; having
primary caregiving responsibility for a child or other household
member who is unable to attend school or another facility that
is closed as a direct result of the COVID-19 and the school or
facility care is required for the claimant to work; becoming the
breadwinner or major support for a household because the head of
household died due to COVID-19; the claimant has quit his/her
job due to COVID-19; the place of employment has closed due to
COVID-19; a job that the claimant was scheduled to start is no
longer available due to the COVID-19 public health emergency; or
the place of employment is inaccessible due to the COVID-19
public health emergency.

additional $300 per week, via a total of $44 billion in FEMA disaster relief funds, to qualified UI benefits applicants.  The period of assistance for LWAP was August 1, 2020, to December 27, 2020.

      f.   Persons applying for PUA benefits did not need to submit any supporting documents to the EDD with their applications.  Claimants entered their total income for the 2019 calendar year on the application.  If the income information provided by the PUA claimant met the annual earnings threshold of $17,368 or more, then EDD worked as quickly as possible to verify the claimant's income using other resources available to EDD to increase the PUA weekly benefit amount.

      g.   Like regular UI claims, PUA applications could be filed online.  As part of the application, the claimant provided his/her name, Social Security Number, and mailing address.  The claimant also stated their employment status and COVID-19-related reason for being out of work.  EDD automatically maintained certain information about the application including the personal information entered in each application, employment data, the date and time the application was submitted, and the IP address of the computer, or Internet Service Provider ("ISP") account that was used to file the application.

      h.   In response to the UI applications, including those submitted pursuant to the PUA program, EDD typically deposited UI funds every two weeks to an Electronic Benefit Payment ("EBP") debit card administered by Bank of America ("BofA"), which the claimant could use to pay for his/her

expenses.  The EBP cards were sent via the USPS to the claimant at the address the claimant provides in his/her UI claim. Claimants could activate his/her debit cards over the phone or online.

i.    To continue receiving UI benefits, claimants were required to submit online a Continued Claim Form which certified every two weeks, under penalty of perjury, that he/she remained unemployed and was eligible to receive UI benefits.  EDD deposited payments to the EBP debit cards only after it received the Continued Claim Form.

j.    The submission of the PUA claims caused mailings to the addresses provided on the applications, including mailings of EBP debit cards administered by BofA that were used to access the UI benefits.  Claimants could then use the EBP debit cards to withdraw UI benefits by making cash withdrawals at ATMs and point of sale purchases at merchants across the United States.

**A.    Schemes to Fraudulently Obtain UI Benefits**

5.    Based on my training, experience, education, and discussions with other trained law enforcement personnel, along with information provided by sources of information and confidential sources, your Affiant knows that individuals scheming to fraudulently obtain UI benefits generally follow recognizable patterns, including, but not limited to, the following:

a.    Schemers use the identities of other people to file fraudulent UI benefits claims in other persons' names and

then collect the UI funds.  In some instances, the named claimants are victims of identity theft; in other instances, the named claimants voluntarily give their personal identifying information ("PII") to the schemers and agree to pay the schemers a portion of the fraudulent benefits that are obtained.

b.   Schemers submit multiple UI claims from the same IP address for multiple claimants.

c.   Schemers tend to submit multiple UI claims close in time.

d.   To maximize the number of UI applications filed in a short time period, schemers re-use and repeat similar or identical application information resulting in identifiable patterns across multiple UI claims data.  For instance, schemers will list the same employer or income information on multiple applications and/or implement a common naming convention for multiple claimant email addresses that they must create for each application (e.g., johndoeCOVID123@gmail.com, "covidkidsABC@gmail.com")

e.   Schemers use common mailing addresses that they control on UI applications so that EBP debit cards and other EDD correspondence will be mailed to these addresses where they can collect them.

**B.   Fraudsters Tend to Keep Records, Cash, and PII for Years**

6.   Based on my training, experience, education, and discussions with other trained law enforcement personnel, along with information provided by sources of information and

confidential sources, your Affiant knows that individuals scheming to fraudulently obtain UI benefits generally keep records, cash and PII for years to assist them in other fraudulent schemes.

7.   Individuals defrauding UI programs often keep large amounts of United States currency on hand.  These subjects commonly maintain such currency where they have ready access to it, such as in their homes and vehicles.  It is also common for subjects of such fraud schemes to possess proceeds and items purchased with the proceeds in their homes and vehicles years after the fraud.  Thus, it is common for currency, pre-paid debit cards, fraudulent identification cards, currency checks, expensive jewelry, precious metals, or financial instruments to be found in their possession and/or home.

a.   Subjects defrauding UI programs often maintain debit cards and mailings distributed by state workforce agencies ("SWA") in order to continue to receive the funds and utilize them through ATM transactions or point of sale purchases. Subjects committing such fraud schemes commonly maintain such items in their homes or in their vehicles.

b.   Subjects conducting such UI fraud schemes often maintain paper records of their fraudulent UI activity for years for their future schemes. Your Affiant knows that such records are commonly maintained for long periods of time and therefore are likely to be found at the SUBJECT'S PREMISES and the SUBJECT VEHICLE.

c.   Subject conducting such UI fraud schemes commonly use computers, cellular telephones, and other electronic devices to communicate with other fraudsters about their activities through the use of telephone calls, text messages, email, chat rooms, social media, and the other internet-and application-based communication forums to obtain and distribute personal identifying information.  The subjects committing such fraud schemes also utilize these devices to apply for the UI benefits and transfer and receive the benefits. Therefore, evidence related to UI defrauding is likely to be found on electronic storage media found at the SUBJECT PREMISES, as further described below.

8.   In addition to items which may constitute evidence, fruits and/or instrumentalities of the crimes set forth in this Affidavit, your Affiant also requests permission to seize any articles tending to establish the identity of persons who have dominion and control over the Subject Premises, including receipts, utility bills, telephone bills, addressed mail, personal identification, keys, purchase receipts, sale receipts, photographs, vehicle pink slips, and vehicle registration.

## IV. SUMMARY OF PROBABLE CAUSE

9.   DOL-OIG, EDD Investigations, Federal Bureau of Investigations ("FBI"), United States Postal Inspection Service, Homeland Security Investigations, United States Secret Service, United States Department of Homeland Security – Office of Inspector General, and the California Department of Corrections and Rehabilitation – Special Service Unit ("CDCR-SSU") are

investigating a fraudulent scheme in which the perpetrators fraudulently apply for and obtain UI benefits under the PUA provision of the CARES Act, a provision that is designed to help unemployed individuals obtain UI benefits as part of the nation's response to the economic harms caused by COVID-19.

10.   The investigation has revealed that the SUBJECT PREMISES has been used on several fraudulent EDD applications and that fraudulently obtained EBP debit cards have been mailed to the SUBJECT PREMISES.  The investigation has also revealed that once the EBP cards have been mailed, that LACEY uses the SUBJECT VEHICLE to drive to various ATM Machines to use the fraudulently obtained EBP Cards.  Evidence from this investigation shows that LACEY still resides at the SUBJECT PREMISES and still uses the SUBJECT VEHICLE as her main mode of transportation.  Essentially, the investigation has revealed that LACEY has been linked to fraudulent EDD applications and the fraudulent use of EBP Cards.

### V.   **STATEMENT OF PROBABLE CAUSE**

11.   I received this case in February 2023.  Based on my review of the file, the warrants, subpoenas, and the representations from other agents, I am aware of the following information regarding this investigation:

### A.   **Bank of America Links LACEY to EDD debit cards**

12.   In February 2021, DOL-OIG received information from Tim Whitesitt, Vice President/Senior Investigator from BofA's Fraud Investigations Group.  He said the following information:

10

a.   He said that the phone number (626) 421-9837 ("9837 Number") called BofA in reference to six EDD debit cards.

b.   BofA searched customer records for the 9837 Number and learned that the phone number was listed on two BofA checking accounts ending x8153 and x8205.  The two checking accounts were opened in LACEY's[2] name on July 22, 2020, and the address for these accounts is the SUBJECT PREMISES.

c.   In total[3], Whitesitt indicated that the customer service department call data showed that the 9837 Number was used to call BofA regarding approximately 34 EDD accounts.

**B.   The FBI's Investigation Regarding Paris Denise Thomas and her Co-conspirator "MeMe's" Fraud Scheme**

13.  In June 2021, DOL-OIG received information from Special Agent Amy Pfeifer with the FBI about Paris Denise Thomas ("Thomas"), a then target of a UI fraud investigation and her co-conspirator "Meme's" involvement in a UI fraud scheme.  On February 14, 2022, Thomas was convicted of one count of wire fraud affecting a financial institution in violation of 18 U.S.C. § 1343, in the United States District Court, Central District of California, case number 5:21-CR-00104-JGB.  Thomas's scheme caused approximately $477,000 benefits to be fraudulently disbursed.

---

[2] According to BofA records, LACEY is employed by California State University, Los Angeles and lists her occupation as "law enforcement."

[3] In October 2022, Whitesitt alerted DOL-OIG that the 9837 Number was used to call regarding 28 additional EDD accounts not previously identified in February 2021.

14.   As part of the investigation, the DOL-OIG had discovered that 47 fraudulent UI claims were submitted to EDD from the same IP address.  That IP address was linked to Thomas's home.  DOL-OIG referred the case to the FBI for further investigation.   As a result, the FBI sought a search warrant for Thomas's home.

a.   on February 3, 2021, United States Magistrate for the Central District of California, Sheri Pym authorized a search warrant for Thomas's home, in case number 5:21-MJ-36. The FBI obtained Thomas's cellphone and FBI Forensic Examiner Glen Gillett conducted a forensic review of the phone.   During the review, Examiner Gillett flagged communications between Thomas and "Meme" at the 9837 Number– the same phone number that BofA had flagged because of the multiple calls and text messages about different EDD debit cards.

i.   In those communications, there were text messages between Thomas and an individual named "Meme."  The messages were dated between November 29, 2020, and February 3, 2021, and discussed in explicit terms the filing and the periodic re-certification of UI claims filed in the names of other people including individuals who I confirmed through California state prison records were incarcerated during the time period when the UI applications were filed.  Specifically, numerous text messages between Thomas and "Meme" discussed the status of UI applications for various inmates and other

individuals referenced by name, the exchange of PIN codes, requests for money transfers via the Cash App,[4] and about the online certification for UI benefits for UI claims made on behalf of other people.

15.  Based on my training and experience investigating UI fraud schemes I know that people engaged UI fraud schemes must create PIN numbers to access UI benefits on EBP debit cards. Also, as discussed in paragraph four and five above, I know that EBP debit cards funded with UI benefits required users to re-certify that the claimant remained eligible to receive UI benefits in order to continue receiving UI benefits.

16.  After receiving the text communications between Thomas and "Meme," on July 09, 2021, DOL-OIG Special Agent Kristina Oh obtained subscriber information from T-Mobile for the 9837 Number.  She learned that the 9837 Number was registered to Deborah Hemphill and the SUBJECT PREMISES was listed as Hemphill's address.[5]  According to the DMV records, Hemphill resides at the SUBJECT PREMISES as listed on her March 3, 2022, driver's license application.

     a.  On March 20, 2023, Criminal Investigator Ignacio Romo's records from CA EDD, reflect that Hemphill is not employed.  EDD employment records indicate that Hemphill

---

[4] Cash App is a mobile digital wallet and payment service available for use on digital devices.  Cash App allows users to electronically transfer money to one another by various means including by linking their Cash App accounts to existing bank accounts.

[5] I do not know what Hemphill's relationship is to LACEY.

receives state assistance through In-Home Support Services ("IHSS") and LACEY receives compensation from IHSS to care for Hemphill.

### C.    LACEY Used Fraudulently Obtained EBP Debit Cards

17.   In February 2021, Assistant Special Agent in Charge Michael Blas with DOL-OIG obtained from BofA surveillance images and bank records for various accounts opened under the names of the people referenced in "Meme's" text messages.

18.   In February 2023, I reviewed the ATM surveillance images that capture the use of these accounts at BofA ATM machines.  The images show multiple instances of a woman driving a white Acura sedan bearing a temporary California license plate number AL27M19[6] ("SUBJECT VEHICLE"), using EBP debit cards in eight other people's names.   The SUBJECT VEHICLE is registered to LACEY.  I compared LACEY's California driver's license photograph with the ATM surveillance photographs and they appear to be the same person.  Based on this information, I believe that LACEY is the person using these EBP debit cards.  I also believe that "Meme" is LACEY and that "Meme" is a nickname for Demetria.

19.   Specifically, the review of ATM surveillance footage and BofA records revealed, among other things, the following activity:

---

[6] This temporary plate has since been replaced with a permanent license plate with the plate number: 8SHJ632. On March 2021, according to the DMV, the temporary plate number AL27319 was registered to LACEY at the SUBJECT PREMISES.

a.   Between July 7, 2020, and July 27, 2020, LACEY used an EBP debit card held in the name of claimant D.C. at various ATM locations in Pasadena, California on multiple dates. All the ATMs were approximately 2.3-4.5 miles away from the SUBJECT PREMISES.  According to CDCR records, D.C. has been incarcerated since May 2019, making D.C. ineligible to receive UI benefits. CDCR records also indicate that D.C. is a member of the Pasadena Denver Lane Bloods Gang and is serving a life sentence for murder without parole.  The photographs in Exhibit A show LACEY withdrawing UI benefits using the EBP card issued to D.C. in the SUBJECT VEHICLE.[7]

b.   Between July 23, 2020, and August 3, 2020, LACEY used an EBP debit card held in the name of claimant N.M. at various ATM locations on multiple dates.  All the ATMs were approximately 2.3-4.5 miles from the SUBJECT PREMISES. According to CDCR records, N.M. was incarcerated from October 2017 to May 2021, making N.M. ineligible to receive UI benefits in 2020.  N.M. is listed as a former member of the Peckerwoods Criminal Street Gang and was convicted of burglary and using the ID of another to obtain personal identifying information.  The photographs in Exhibit B show LACEY making the ATM withdrawals using the account opened under N.M.'s name in the SUBJECT VEHICLE.

c.   Between July 23, 2020, and August 3, 2020, LACEY used an EBP debit card held in the name of claimant D.V. at

---

[7] In the photographs, the SUBJECT VEHICLE has temporary tags on it.

various ATM locations on multiple dates.  All the ATMs approximately 2.3-4.5 miles from SUBJECT PREMISES.  According to CDCR records, D.V. has been incarcerated since June 2004 to the present day, making D.V. ineligible to receive UI benefits. According to CDCR records, D.V. is a former member of the Varrio Market Street Sureno and is serving a life sentence for attempted murder with a firearm.  The ATM surveillance images in Exhibit C show LACEY withdrawing UI benefits from a card issued under D.V.'s name in the SUBJECT VEHICLE.

d.   On September 15, 2020, LACEY used an EBP debit card held in the name of claimant C.T. at an ATM approximately 2.3 miles from SUBJECT PREMISES.  According to CDCR records, C.T. was incarcerated from February 2004 until he died in January 2021, making C.T. ineligible to receive UI benefits in 2020.  According to CDCR records, C.T. is a former member of a Sacramento Outlaw Motorcycle Gang and served a life sentence for lewd and lascivious acts with a child, and annoying/molesting a child.  The ATM surveillance images in Exhibit D show LACEY in the SUBJECT VEHICLE withdrawing UI benefits from a card issued under C.T.'s name.

20.  LACEY also used four other EBP cards.  These four claimants were E.V., R.R. R.F. and T.J.  DOL-OIG agents reviewed ATM surveillance photos that show she used these cards on multiple occasions to withdraw UI benefits from ATM machines between July and September 2020.

D.   **Lacey Created Fraudulent EDD Applications**

21.   Based on the eight different EBP debit cards that I
saw LACEY use in BofA surveillance images, I reviewed EDD
application data that corresponds to those cards.  The review of
the eight accounts and a broader search across UI applications
revealed that at least 92 other applications for UI benefits
shared common information as used for the eight cards LACEY
used.

22.   As part of the investigation, I reviewed UI
applications for the four EBP debit cards in the names of
inmates.  Table 1 below sets forth the UI claims for the four
claimants who were inmates in custody of California State
Prisons, and whose EBP debit cards LACEY used.

| TABLE 1 | | | | | |
|---------|----|----|----|----|----|
| Claimant | Claimed Occupation | Date Work Affected | Date Claim Filed | Amount of Claim and Status | Dates of Incarceration in CA |
| C.T. | Carpenter/ Construction/Laborer | 2/6/20 | 6/24/20 | Approved $29,258 | 2/13/04 to 1/8/21 |
| D.C. | Service Person/ HVAC/ Window/ Lawn Mower Technician | 2/6/20 | 6/2/20 | Approved $12,569 | 11/30/00 to Present |
| D.V. | Hair Stylist/ Barber | 3/10/20 | 7/9/20 | Approved $20,814 | 6/16/04 To Present |
| N.M. | Final-touch-Up Painter | 3/12/20 | 7/9/20 | Approved $20,814 | 10-23-17 to 5-31-21 |

23.   I also reviewed the UI applications for the remaining
four claimants, whose EBP debit cards were also used by LACEY.
Table 2 below sets forth the UI claims for the four remaining
claimants:

17

| TABLE 2 | | | | | |
|---------|-----|-----|-----|-----|-----|
| Claimant | Claimed Occupation | Date Work Affected | Date Claim Filed | Amount of Claim and Status | Commonality |
| E.V. | Hair Stylist/ Barber | 3/10/20 | 7/15/20 | Approved $21,482 | Filed from IP Address 172.119.204.253 |
| R.R. | Carpet Cleaner/ Final-Touch-Up Painter | 3/12/20 | 7/24/20 | Approved $21,482 | Filed from IP Address 172.119.204.253 |
| R.F. | Final-Touch-Up Painter/ Hair Stylist /Barber | 3/12/20 | 7/23/20 | Approved $15,906 | Filed from IP Address 172.119.204.253 |
| T.J. | Lawn Mower Technician | 2/6/20 | 6/12/20 | Approved $22,382 | Filed from a Virtual Private Network |

24.  I have also reviewed the IP addresses used to file the UI applications for the eight aforementioned claims and found that seven of the eight claims were filed from IP addresses 71.80.128.35 and 172.119.204.253.  The eighth UI application was filed from a Virtual Private Network,[8] and agents were unable to identify the subscriber.

25.  According to EDD records, IP address 71.80.128.35 was used to file an additional 41 UI claims.  According to Charter Communications, the subscriber for IP address 71.80.128.35 is

---

[8] A virtual private network (VPN) is a mechanism for creating a secure connection between a computing device and a computer network, or between two networks, using an insecure communication medium such as the public Internet.  A VPN can extend a private network (one that disallows or restricts public access), enabling users to send and receive data across public networks as if their devices were directly connected to the private network.  VPNs cannot make online connections completely anonymous, but they can increase privacy and security. To prevent disclosure of private information or data sniffing, VPNs typically allow only authenticated remote access using tunneling protocols and secure encryption techniques. Source: https://en.wikipedia.org/wiki/Virtual_private_network

Darryl Witt[9] and the service address was 11958 1st Ave, Apt. 6, Hesperia, California 92345.

26.   According to EDD records, IP address 172.119.204.253 was used to file an additional 51 UI claims.

a.   According to Charter Communications, the subscriber for IP address 172.119.204.253 was registered to Mattie Thomas, at 2619 Flint Way, Apt 16, San Bernardino, California 92408.  IP address 172.119.204.253 is linked to Thomas who resided at the Flint Way address and was convicted of EDD fraud.

**E.   EDD Records Show Fraudulently Obtained UI Benefits Were Sent to SUBJECT PREMISES**

27.   In August 2021, Special Agent Christina Wang with DOL-OIG obtained UI application data from EDD for UI applications that listed the SUBJECT PREMISES, as the purported claimants' mailing address, which revealed that between June 2020 and April 2021, one UI application used the SUBJECT PREMISES, as a claimant mailing address.  The claimant who listed the SUBJECT PREMISES as a mailing address was D.C.

28.   Special Agent Wang reviewed the EDD application records and identified the following indicia of fraud:

a.   As noted above, D.C.'s application was presumptively fraudulent because D.C. was incarcerated on June 2, 2020, when the application was filed and he was ineligible to receive UI benefits.  The email address provided to EDD for D.C.'s UI claim was "DELACEY04@yahoo.com."

_____

[9] I do not know what Darryl Witt's relationship is to LACEY.

19

29.   In March 2023, According to Criminal Investigator Ignacio Romo's records from CA EDD, from June 2020 to July 2020, California EDD paid out approximately $12,841.00 in UI benefits on the UI claimant D.C. which was mailed to the SUBJECT PREMISES.

30.   In February 2023, I identified the SUBJECT PREMISES as LACEY's current primary residence based on law enforcement databases and public records.  I also reviewed JPay records for an account held in LACEY's name that was opened on March 22, 2020.  The address provided to JPay for LACEY's account is the SUBJECT PREMISES.  The phone number provided to JPay for LACEY's account is the 9837 Number and the email address is Dlacey@calstatela.edu.  According to JPay records, LACEY has made 20 money transfers to seven inmates, including D.C.

31.   As of March 2023, the 9837 Number is still She learned registered to Deborah Hemphill and the SUBJECT PREMISES is still listed as Hemphill's address.  I reviewed recorded phone conversations provided by CDCR and revealed that the 9837 Number still has frequent regular communications with D.C. and other inmates currently incarcerated at the Los Angeles County California State Prison in Lancaster, California.

**F.   Cash Deposited in LACEY'S Checking Accounts**

32.   I discovered through information from BofA Whitesitt and Criminal Investigator Ignacio Romo's records from CA EDD, that between June 2020 and December 2020, eight fraudulent EBP

debit cards in the names of D.V., C.T., D.C., E.V., N.M., R.R.,
R.F., and T.J. were used to withdraw approximately $123,010.00
in cash from ATM.

33.   On July 22, 2020, LACEY opened two BofA checking
accounts ending x8153 and x8205.  The address listed for the
accounts is the SUBJECT PREMISES.  The employer listed for the
account is California State University Los Angeles and the
occupation listed is law enforcement.  The phone number
associated with the accounts is the 9837 Number and the email
address provided is dlacey@calstatela.edu.

34.   Between July 23, 2020, and January 26, 2021,
approximately $35,020 in cash, $4,900 in United States Postal
Service ("USPS") money orders, and a $10,000 check from the
Bellagio Casino were deposited into LACEY's checking accounts
ending x8153 and x8205.  The BofA deposit slips contained
LACEY's name, the 9837 Number, and address as the SUBJECT
PREMISES.

35.   Based on my training and experience, along with
conversations with other agents, I know that criminals sometimes
deposit fraudulent cash proceeds into their bank accounts.
Criminals sometimes used fraudulent cash proceeds to purchase
UPS money orders and then depositing those money orders in their
personal bank accounts.  By purchasing the USPS money orders,
criminals avoid depositing cash and evade detection by bank

officials and law enforcement.  I also know that criminals
sometimes take fraudulent cash proceeds to casinos and purchase
gambling instruments and then cash out.  The casino then pays
out the monies in the form of a check.  The criminal can then
deposit the check into their bank account and give the
appearance that the criminal received gambling winnings.

### G.    LACEY Currently Lives at the SUBJECT PREMISES and Drives the SUBJECT VEHICLE

36.  On September 2, 2022, United States Postal Inspector
Rocio Gonzalez with the United States Postal Inspection Service
confirmed that LACEY has been receiving mail at SUBJECT PREMISES
and received mail addressed to her at that address on September
1, 2022.

37.  On March 16, 2023, I conducted surveillance at SUBJECT
PREMISES, and I saw exit the garage structure of the SUBJECT
PREMISES and drive away in the SUBJECT VEHICLE.

38.  Based on these facts and my experience, I believe that
evidence of fraud and additional perpetrators who are involved
with this scheme may be found at SUBJECT PREMISES and in the
SUBJECT VEHICLE.  I know that schemers and others engaged in
identity theft related schemes maintain evidence of their
offenses on their person, in their residences, in their cars,
and on their digital devices even long after committing the
offenses.  For instance, schemers typically maintain records in
physical or digital notes containing personal identifying
information such as social security numbers, names, and dates of
birth because filing multiple claims requires careful

documentation of this voluminous information.  With respect to
UI related schemes, I understand that schemers must often record
the various fictitious email addresses and email passwords so
that they can access correspondence from EDD and periodically
re-certify information to continue receiving UI benefits.
Furthermore, in cases where the schemers have filed UI
applications on behalf of others, they must also maintain
ledgers to track payments to and from co-schemers who have
assisted the scheme by obtaining the UI funds from an ATM,
recovering EBP debit cards from various mailing addresses, or
providing the stolen PII.

    39.  Additionally, based on my training and experience, I
know that perpetrators involved in UI fraud schemes typically
use digital devices in furtherance of their schemes.  This
involves the use of digital devices, such as cell phones,
computers, and tablets.  In UI fraud schemes, digital devices
are often used for the following purposes: applying online for
UI benefits; verifying the status of fraudulent UI claims;
researching information, such as social security numbers and
dates of birth, for potential identity theft victims; and
verifying the status of fraudulently obtained EBP debit cards
issued by BofA.  It is also common for perpetrators to keep
profiles of identity theft victims, which are used to file
fraudulent UI claims.  Such profiles are often stored on digital
devices and may contain the names, social security numbers,
dates of birth, and driver's license numbers of identity theft
victims.

40.  Digital devices may also contain automated text messages generated from BofA accounts confirming when funds are deposited or transferred from fraudulently opened accounts. Lastly, co-schemers involved in UI fraud will often communicate with each other regarding their schemes via phone call, text message, messaging applications, email, and social media.  Such communication can be found in digital devices used by the perpetrators involved in UI fraud schemes.  For instance, in this investigation, we understand based on records obtained from Thomas's cellular phone, that the schemer communicated with LACEY via SMS to discuss the status of UI applications for various inmates and other individuals, pin codes, and request monetary exchanges via Cash App.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[10]

41.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally,

_____

[10] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

42.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

e.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

f.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

43.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

g.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

h.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

i.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress LACEY's thumb and/or fingers on the

device(s); and (2) hold the device(s) in front of LACEY's face with her eyes voluntarily open to activate the facial-, iris-, and/or retina-recognition feature.

44.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## REQUEST FOR SEALING

45.  It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of these applications, including the application and search warrant affidavit.  I believe that sealing is necessary because the items and information to be seized is relevant to an ongoing investigation into criminal conduct involving multiple individuals and entities, both currently known and unknown, and many of the targets of the investigation remain unaware that they are being investigated. Disclosure of the search warrant affidavit at this time would seriously jeopardize the investigation, as such disclosure may provide an opportunity to destroy evidence, change patterns of behavior, or allow flight from prosecution.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on this continuing investigation and may severely jeopardize its effectiveness.

## **<u>CONCLUSION</u>**

46.   For all the reasons described above, there is probable cause to believe that evidence of violations of the Subject Offenses, described in Attachment B, will be found in a search of the SUBJECT PREMISES, SUBJECT VEHICLE, and on LACEY's person, as further described above and in Attachments A of this affidavit.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this____ __ day of
March 2023.


_____
UNITED STATES MAGISTRATE JUDGE

29

<u>**ATTACHMENT A-1**</u>

<u>PREMISES TO BE SEARCHED</u>

The SUBJECT PREMISES is a multi-family residence located at 586 East Washington Boulevard, Apartment 4, Pasadena, California 91104.

The SUBJECT PREMISES is sand in color with a brown roof and a semi-underground black gated garage structure, located on the front left side of the building, with an adjoining driveway facing north. Above the entrance of the garage structure, the number "586" is affixed on a front-facing wall, in black lettering. Above the garage structure and the black lettering is a balcony, enclosed by a black railing. To the left of the garage structure, there is a large palm tree adjacent to the sidewalk. The complex is protected by concrete walls and two black metal gates on the left and right sides of the property. There is a small set of stairs that lead to a gated apartment entry door on the left side of the building. The gated apartment entry door has a telephone entry system.

The Apartment 4 is located on the southeast end of the apartment complex. The structure is broken into two buildings. Apartment 4 is located on second building on the south end of the complex. The apartment is clearly labeled on a white wooden door with a gold brass number "4" that is facing east. The door swings south upon entry.

i

The SUBJECT PREMISES includes all rooms, attics, storage areas and units, boxes, safes, lockers, bags, trash bins or bags, trash areas, mailboxes, and any containers found in the aforementioned areas, including the white Acura sedan bearing California license plate 8SHJ632 registered to Demetria Shaunta Lacey ("SUBJECT VEHICLE").

The SUBJECT PREMISES is further described in the following photographs:














**ATTACHMENT B**

**I.   ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, and/or instrumentalities of violations of Title 18, United States Code, Sections 1029 (fraud and related activity in connection with access devices), 1028A (aggravated identity theft), 1040 (fraud in connection with emergency benefits), 1341 (mail fraud), 1343 (wire fraud), and 1349 (attempt and conspiracy to commit mail or wire fraud) (the "Subject Offenses"):

        a.    For the period of March 1, 2020, to the May 1, 2021, records, documents, correspondence, faxes, and e-mails sent to and received from any State Workforce Agency[11] including the California Employment Development Department, including any applications for Unemployment Insurance.

        b.    For the period of March 1, 2020, to the May 1, 2021, records, documents, correspondence, faxes, and e-mails sent to and received from any individual that received Unemployment Insurance benefits from any State Workforce Agency.

        c.    For the period of March 1, 2020, to May 1, 2021, records and documents containing information, including Personally Identifiable Information, e.g., names, Social Security Numbers, dates of birth, addresses, phone numbers, and driver's license numbers, to be used in support of any

---

        [11] The Department of Labor defines and links to State Workforce Agencies at: https://www.dol.gov/agencies/eta/wotc/contact/state-workforce-agencies (last visited Oct. 12, 2021)

application for Unemployment Insurance, and/or any claim of continuing eligibility for Unemployment Insurance.

d.   For the period of March 1, 2020, to May 1, 2021, checks and EBP cards received from any State Workforce Agency including the California Employment Development Department.

e.   Payroll and personnel records, receipts, IRS Forms W-2, IRS Forms W-4, IRS Forms 1099, State and Federal Tax Returns.

f.   Copies of and actual driver licenses, state identification cards, passports, and other forms of identification.

g.   Indicia of occupancy, residency, control, and/or ownership of the SUBJECT PREMISES, including utility bills, telephone bills, loan payment receipts, rent documents, keys, photographs, and bank records, to be limited to fifteen separate items.

h.   For the period of March 1, 2020, to the May 1, 2021, bank records or records received from financial institutions, including debit cards; correspondence regarding debit card accounts; wire transfer records; bank statements and associated transactional records; money drafts; letters of credit; safety deposit box keys and records; checkbooks; money wrappers; money containers; income tax records; payroll records; credit cards; and any other records of financial transactions that reflect the disposition and/or allocation of monies.

i.   Applications for and expenditure of EDD benefits.

       j.    The opening, closing, or use of financial accounts in the name of, or controlled by, Demetria Shaunta Lacey.

       k.    Any records of companies and or business owned or controlled by Demetria Shaunta Lacey.

       l.    Cash or cash equivalents such as pre-paid cards in excess of $500.

       m.    For the period of March 1, 2020, to the present, records relating to the acquisition, secreting, transfer, concealment, and/or expenditure of money.

       n.    Records relating to any travel to any California state prison fac Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls.

       o.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the Subject Offenses.

       p.    Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written

communications sent to or received from any digital device and which relate to the Subject Offenses.

q.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

r.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and

connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

2.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and

vii

attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.  If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.  If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital

device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

3.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

4.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Demetria Shaunta LACEY's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct

which specific finger(s) and/or thumb(s) shall be depressed; and
(2) hold the device in front of LACEY's face with her eyes
voluntarily open to activate the facial-, iris-, or retina-
recognition feature, in order to gain access to the contents of
any such device.  In depressing a person's thumb or finger onto
a device and in holding a device in front of a person's face,
law enforcement may not use excessive force, as defined in
Graham v. Connor, 490 U.S. 386 (1989); specifically, law
enforcement may use no more than objectively reasonable force in
light of the facts and circumstances confronting them.

5.   The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not
apply to any search of digital devices pursuant to any other
court order.

x

EXHIBIT A









EXHIBIT B













EXHIBIT C









EXHIBIT D



